UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Michael Arthur, | : | Case No. 1:13-cv-382 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| American Showa, Inc., | : | |
| | : | |
| Defendant. | : | |

**ORDER**

Before the Court is Defendant's motion for summary judgment.  (Doc. 23)

Defendant seeks judgment on Plaintiff's claims under the American with Disabilities Act

and analogous state law, and argues that Plaintiff cannot establish a prima facie case.

Plaintiff opposes the motion (Doc. 27), and Defendant has filed its reply.  (Doc. 31)  For

the following reasons, the Court will grant Defendant's motion.

**FACTUAL BACKGROUND**

Plaintiff, Michael Arthur, began working for American Showa, Inc. ("ASI") in

March 1999.  ASI manufactures parts for power steering systems and shock absorbers

used in various types of motor vehicles.  It has a manufacturing plant in Blanchester,

Ohio where Arthur worked in several departments, including machining, casting, and

assembly.  Sometime in the 1990's when he worked for a previous employer, Arthur

injured his back and filed a worker's compensation claim.  He testified that during this

time, he was diagnosed with spina bifida occulta.  He could not recall the name of the

physician who diagnosed this condition.

According to the Mayo Clinic, spina bifida occulta is the mildest form of spina

bifida, a birth defect that causes malformation of the spinal cord.  Spina bifida occulta does not usually involve the spinal nerves, and most children with this form of the defect have no signs or symptoms and experience no neurological problems.  It is typically discovered on an x-ray or other imaging tests done for unrelated reasons.[1]

In early 2002, Arthur had surgery to fuse some discs in his spine.  He returned to work at ASI but had continuing difficulties with his back.  ASI granted him leave from his job under the Family and Medical Leave Act, and he received short term disability benefits for a period of time.  Sometime in early 2004, with his back troubles continuing, Arthur requested that ASI accommodate his condition by limiting certain job functions, including heavy lifting.  ASI sent Arthur for an IME performed by Dr. Randolph, who specializes in disability evaluations and occupational medicine.  In his April 20, 2004 written report to ASI, Dr. Randolph opined that Arthur

> ... will likely have chronic low back pain and require chronic and permanent restrictions with respect to his work activities. ... It is highly unlikely that he will ever be able to return to unrestricted work activities and in my opinion the need for restrictions is permanent.  I would specifically indicate that bending, twisting and stooping should be performed on an occasional and not repetitive basis.  It is my opinion [that] lifting and carrying up to a 20 pound maximum would be adequate.  He should be permitted to change positions on an as needed basis.  There is no foreseeable time in the future at which those restrictions would be reconsidered.

(Doc. 27, Ex. 2 at 6-7)

Arthur concedes that ASI accommodated these restrictions, and placed him in a position as a calibration associate in the quality department at the plant.  He remained

---

[1] See www.mayoclinic.org/diseases-conditions/spina-bifida, last accessed October 10, 2014.

in that job until 2011.  On occasion, Arthur agreed to drive parts from the Blanchester

plant to ASI's customers (such as a Honda plant in southern Ohio).  Greg Harvey,

Arthur's manager in the quality department, testified that this was not a permanent

position.  If ASI needed someone to deliver parts on an expedited basis, and if Arthur

was available, he agreed to perform that task.  Arthur does not dispute that throughout

this period,  ASI accommodated Arthur's restrictions and permitted him to take FMLA

leave as needed for his back.  He does not allege that ASI discriminated against him or

failed to accommodate him prior to the events of December 2011, which give rise to his

lawsuit.

After the economic downturn hit the automotive industry in 2008, ASI embarked

on a reduction in its workforce in 2009.  ASI first eliminated a number of temporary

positions at the plant, and then reduced the number of its full-time employee positions.

According to the testimony and affidavit of LoAnn Burt (ASI's Administration General

Manager), the Blanchester, Ohio plant reduced its staff by over 50 full-time employees

and 100 temporary employees by 2011.  (Doc. 23, Ex. A at ¶¶10-11; Burt Dep. at 52-

53.)

Greg Harvey and Arthur were friends and they socialized together outside of

work.  Harvey testified that ASI created a matrix to guide department managers in

making decisions about positions that would be eliminated in the RIF that began in

2009.  The matrix identified four criteria for evaluating and ranking employees in each

department. These four criteria were the employee's current performance review; past

performance; technical knowledge; and length of service.  (Harvey Dep. Ex. 1)  Harvey

also created his own matrix, which he used to directly compare and rank each of his

-3-

employees. (Harvey Dep. Ex. 2) Harvey managed three types of employees: managers, engineers and line associates (or "techs"). He testified that he wanted to protect his line associates, which included Arthur. In the 2009 implementation of the RIF, Harvey decided to eliminate three of his department's management positions. He believed that he could absorb the duties of those individuals more easily than other positions. The three managers he laid off were ranked lowest on his matrix, were not disabled, and have not returned to work for ASI.

In late 2011, ASI determined that additional positions would have to be eliminated to meet budget projections for 2012. Harvey testified that his direct supervisor, the plant manager Iwan Gibby, gave him a target "to review and to determine what [I] could do to reduce head count. ... [T]he reduction was mandated. The number was still open for discussion." (Harvey Dep. at 18) Harvey believes that the same directive was given to all plant departments. Harvey used the same matrices he prepared and used in 2009 because nothing had substantially changed in his department since then (other than the elimination of three management positions in 2009). He testified that he had three line associates in the calibration area, and Arthur was the lowest ranked of the three. He was doing the simplest work and had the least seniority in the department. Harvey decided to eliminate Arthur's position and divide his work between the other two line employees.

Harvey informed Ginny Whiting, ASI's HR manager at Blanchester, of his decision. Harvey described it as "a matter of fact conversation" and said that Whiting did not ask him any questions about the decision. Whiting arranged a conference call so that she and Harvey could inform Arthur that his job was being eliminated. That

SSB-SKB Doc #: 32 Filed: 11/04/14 Page: 5 of 18 PAGEID #: 383

telephone call occurred on Friday, December 2, 2011, and Whiting wrote a letter the same day to Arthur confirming the conversation and informing Arthur about unemployment benefits and his recall rights.  (Whiting Ex. 3)

After this conversation took place, Harvey learned that another employee in the production control department had been laid off.  Because this employee had originally worked in a job on the manufacturing floor before going to production control, ASI decided to offer that employee a manufacturing position.  Harvey testified that ASI decided to move this employee "... from the indirect department back to a direct manufacturing department.  At that time Ginny and I discussed [that] out of fairness and out of consistency, we should make that same offer to [Arthur] since he had come from the manufacturing department initially."  (Harvey Dep. at 38)[2]  Whiting asked Harvey if Arthur would be interested in a machining position.  The majority of jobs at the Blanchester plant are in the machining department, and those jobs varied widely in their physical requirements.  Whiting knew that Arthur had some previous medical issues, but Harvey was unaware of this; he testified that medical restrictions had never been a problem for him or Arthur while Arthur worked in Harvey's group.  Arthur confirmed this, testifying  that he could do his regular job as a calibration associate without any restrictions.  On occasion, if something heavy needed to be picked up, his boss (Ken Ledford) would simply do it.  (Arthur Dep. at 77)

Whiting and Harvey reached Arthur by telephone the following Monday,

---

[2] Harvey explained that a "direct" position is in manufacturing, including machining.  Indirect positions are all the support jobs, including quality, production control, and office staff.  (Harvey Dep. at 51-52)  Arthur's calibration position was an indirect position.

December 5, and Whiting asked Arthur if he would be interested in a machining position.  Harvey does not remember Whiting describing a specific position during the conversation.  Arthur said he would have to think about it and would get back to her. Harvey did not talk to Arthur again after that telephone call.  A few days later, Whiting told Harvey that Arthur had declined the machining position.

On December 9, Whiting sent a letter to Arthur summarizing their discussions from December 2 to the date of the letter.  Arthur concedes that the letter accurately describes what occurred during these conversations.  (Arthur Dep. at 89) Whiting's letter states that during the December 5 telephone call, Whiting asked Arthur if he would be able to perform a machining job with or without accommodation, and he said he would have to think about it.  On December 8 and December 9, Whiting tried to reach Arthur and left voice messages on his cell phone, asking him to let her know if he was interested in the machining position.  On December 9, Arthur came to the Blanchester plant and met with Whiting.  He told her that he decided not to accept a machining position.  (Arthur Dep. at 89, and Ex. 9)  He did not ask for a copy of the job description for the available machining positions, or go to a doctor to find out if he would be able to do the job with or without restrictions.  He testified that he made his decision based on what Whiting told him.  (Arthur Dep. at 88-89)

Arthur believes that there were jobs in the plant that he could do that were filled by employees with less seniority.  He believes that ASI should have given him one of those positions and transferred that employee into another one.  He said that "... there were jobs that I could do that I told them about, and they just stated, 'We're not bumping people.'" He admitted that in order to be placed into one of those jobs, that  employee

would have to transfer to another position.  (Id. at 89)  He identified racking room associates, forklift associates, and analysis associates as potential candidates.  He conceded that those positions were filled by regular employees and were not being eliminated in the RIF.  (Id. at 84)  He said there had been a "big move" before his layoff when ASI transferred about 30 employees from assembly into the machining department.  Those employees were moved when ASI closed down one of the plant's assembly lines.  And Arthur conceded that he was offered a machining position, as were those employees.  Arthur did not know of any other available open position at the plant at the time he was laid off.  (Id. at 85)  And he admitted that he did not know of any facts suggesting that his layoff was due to anything other than ASI's reduction in force.  (Id. at 88)

Arthur filed a charge of disability discrimination with the EEOC on or about July 21, 2012.  He received a notice of his right to sue in March 2013, and filed his complaint in this case on June 5, 2013.  He alleges claims for disability discrimination under the Americans with Disabilities Act and Ohio Rev. Code 4112, alleging that ASI knew of his disability, and refused to accommodate him.  He further alleges that ASI's decision to terminate him was motivated by his disability.

## DISCUSSION

Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits,

admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

        The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992).  Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute.  Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

        The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

Disability Discrimination

The Americans With Disabilities Amendments Act of 2008 ("ADAAA") prohibits discrimination on the basis of disability in regard to the terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).  To establish a prima facie case of disability discrimination under the statute, Arthur must show: 1) he is disabled; 2) he is otherwise qualified for the position, with or without reasonable accommodation; 3) he suffered an adverse employment decision; 4) ASI knew or had reason to know of his disability; and 5) Arthur was replaced, or his position remained open after he was terminated. Whitfield v. Tennessee, 639 F.3d 253, 259 (6th Cir. 2011)(internal citations omitted). As the elements of a disability claim are essentially the same under the ADAAA and the Ohio statute, the Court will address them together.  Brenneman v. MedCentral Health Sys., 366 F.3d 412, 418 (6th Cir. 2004).

ASI does not dispute the second and third factors of Arthur's prima facie case. But ASI contends that Arthur has not shown that he is "disabled" within the statute's meaning; that Harvey (the sole decisionmaker) knew about Arthur's alleged disability; or that ASI replaced Arthur or held his position open.  ASI contends that Arthur's position was eliminated as part of an objective reduction-in-force, and was not in any way based on his alleged disability.  ASI further notes that there is no dispute that throughout Arthur's employment, ASI accommodated Arthur's job restrictions and provided FMLA leave whenever he requested it.

Arthur responds that there are genuine factual disputes about all three of these factors.  He claims that he is disabled, and that Whiting should have determined if there were any open positions at the plant before the December 2 telephone call.  He

suggests that if she had done so, he would not have been laid off.  He also contends

that a jury could reject ASI's contention that an RIF caused the loss of his job.

Disability is specifically defined by regulations adopted under the ADAAA.  29

C.F.R. §1630.2(g)(1) defines disability as a physical or mental impairment that

substantially limits the individual in a major life activity; or having a record of such an

impairment; or being regarded as having such an impairment.  "Major life activities" are

broadly defined: "Caring for oneself, performing manual tasks, seeing, hearing, eating,

sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing,

learning, reading, concentrating, thinking, communicating, interacting with others, and

working...".  29 C.F.R. §1630.2(i)(1)(I).  The term "substantially limits" must be

construed broadly in favor of coverage under the statute.  29 C.F.R. 1630.2(j)(1)(I).

That regulation further states:

> (ii) An impairment is a disability within the meaning of this section if it
> substantially limits the ability of an individual to perform a major life activity
> as compared to most people in the general population.  An impairment
> need not prevent, or significantly or severely restrict, the individual from
> performing a major life activity in order to be considered substantially
> limiting. Nonetheless, not every impairment will constitute a disability
> within the meaning of this section.
>
> (iii) The primary object of attention in cases brought under the ADA should
> be whether covered entities have complied with their obligations and
> whether discrimination has occurred, not whether an individual's
> impairment substantially limits a major life activity.  Accordingly, the
> threshold issue of whether an impairment "substantially limits" a major life
> activity should not demand extensive analysis.
>
> (iv) The determination of whether an impairment substantially limits a
> major life activity requires an individualized assessment.  However, in
> making this assessment, the term "substantially limits" shall be interpreted
> and applied to require a degree of functional limitation that is lower than
> the standard for "substantially limits" applied prior to the ADAAA.

-10-

Arthur cites a specific section from the Interpretive Guidance on Title I published with the ADAAA regulations, that discusses coverage under the Act for an individual with lifting restrictions:

> Thus, for example, someone with an impairment resulting in a 20-pound lifting restriction that lasts or is expected to last for several months is substantially limited in the major life activity of lifting, and need not also show that he is unable to perform activities of daily living that require lifting in order to be considered substantially limited in lifting.

29 C.F.R. Part 1630, Appendix at Section 1630.2(j)(1)(viii).

ASI relies on Arthur's concessions that he was able to work at ASI, that he took care of his home and helped friends with various manual chores, and that he ran a seasonal landscaping/mowing business, to argue that Arthur is not disabled. But ASI does not dispute that Dr. Randolph opined that Arthur's lifting restriction was chronic and permanent. The fact that these restrictions were imposed in 2004 does not mandate a conclusion that they no longer applied. Arthur testified that on occasion, if there was something heavy that needed lifting, his boss would do it for him. This suggests that the restrictions were in effect in 2011.

The Court will assume that Arthur can establish that he is disabled within the meaning of the ADAAA, as it is clear that the burden is not intended to be a heavy one. Regarding the fourth prong of his prima facie case, ASI's knowledge of this disability, it is clear that ASI "knew" about Dr. Randolph's opinion on Arthur's restrictions. But Arthur has not challenged Harvey's testimony that Harvey was the sole decisionmaker regarding the RIF job eliminations within Harvey's own department. And Arthur has no evidence contradicting Harvey's testimony that he had no knowledge that Arthur was disabled or had any physical impairment. A disability plaintiff must show that the actual

decision-maker knew of his disability, or regarded him as being disabled.  It is not enough to show that someone at his employer may have known about it.  See Nilles v. Givaudan Flavors Corp., 521 Fed. Appx. 364, 368. 2013 U.S. App. LEXIS 6416 (6th Cir., March 29, 2013), and cases cited therein.  Arthur testified that he and Harvey were friends, and they often went fishing together.  Arthur does not claim that he ever told Harvey about his disability or his restrictions.  There is nothing in the record raising a genuine factual dispute that Harvey knew that Arthur was disabled, or was aware of his impairments or the restrictions recommended by Dr. Randolph.

In addition, Arthur has not come forward with evidence raising a genuine factual dispute about the fifth prong of his prima facie case, that ASI replaced him or held his job open after he was laid off.  Harvey testified that Arthur's duties were absorbed by two more senior co-workers.  Arthur has no admissible evidence that challenges Harvey's testimony.  He testified that someone told him that Maria Brooker had taken his old job. He does not know how that person may have learned this information.  Arthur knew that Brooker worked at ASI before he was laid off, and the person who told him that Brooker took his job also said that she was doing Arthur's job and her own.  (Arthur Dep. at 64-66)  This does not create a **genuine** factual dispute about whether ASI replaced him after he was laid off.

But even if Arthur could establish a prima facie claim, ASI contends that an employer's implementation of a reduction-in-force is a legitimate, non-discriminatory reason for an employee's termination.  In RIF cases, the Sixth Circuit has held plaintiffs to a heightened burden of proof to demonstrate that the RIF was not the true reason for the termination. "Generally, to meet this heightened standard, the plaintiff must provide

additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons. ... [T]he evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff on the basis of his disability." Yost v. Henkels & McCoy, Inc., 2013 U.S. Dist. LEXIS 85302, at **16-17 (S.D. Ohio 2013), quoting Geiger v. Tower Auto., 579 F.3d 614, 623-24 (6th Cir. 2009).  There is nothing in this record giving rise to a reasonable inference that ASI singled out Arthur for termination because of his job restrictions or his disability.

Arthur contends that ASI lacked an objective plan for conducting its reduction-in-force, and therefore it cannot serve as a legitimate explanation.  But Harvey explained that ASI distributed a matrix of factors for use by its managers in the RIF.  The factors used in that matrix were objective, based on current and past performance reviews, the extent of an employee's technical knowledge, and years of service.  Harvey also developed his own matrix, directly comparing each of his employees on a one-to-one basis, to assist him in making a decision about which position to eliminate.  Arthur proffers no evidence suggesting that Harvey failed to adhere to the results of his objective evaluation in reaching his decision.  Moreover, Arthur freely admitted that his job was eliminated as part of the RIF (Arthur Dep. at 66), and that he knew of no facts suggesting it was for some other reason.  (Id. at 88)  He suggests that a jury "could" reject ASI's explanation.  But in the absence of any admissible evidence to contradict ASI's explanation, the jury would simply be speculating on that possibility.

The Court concludes that Arthur has not established a prima facie case of disability discrimination.  Even if the evidence is sufficient to satisfy that burden, ASI has

-13-

offered a legitimate, non-discriminatory reason for Arthur's termination.  And Arthur has

not come forward with evidence raising a genuine dispute about pretext.  In order to do

so, Arthur would have to show that ASI's proffered reason had no basis in fact, did not

actually motivate his termination, or was insufficient to motivate his termination.  Imwalle

v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008) (citing Manzer v.

Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)).   The evidence in

the record fails to establish a dispute about any of these factors.  ASI is entitled to

judgment on Arthur's disability discrimination claims.

Failure to Accommodate

Arthur describes his primary claim as one based on ASI's failure to accommodate

him by offering him another position within his restrictions.  An employer has a duty

under the ADAAA to reasonably accommodate an employee's disability, unless the

employer can show that the accommodation would impose an undue hardship on the

operation of its business.  See, e.g., Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir.

1997), quoting 42 U.S.C. § 12112(b)(5).  A failure to accommodate claim requires  Arthur

to show that he has a disability; he was qualified for the job with or without restrictions;

and ASI refused his request for an accommodation.  Hedrick v. Western Reserve Care

Sys., 355 F.3d 444, 452 (6th Cir. 2004).

Arthur has demonstrated, for purposes of summary judgment, that he has a

disability.  And ASI does not dispute that Arthur was qualified for the job it offered him on

December 5.  ASI notes that it had no duty after December 2, when Arthur's position was

eliminated in the RIF, to accommodate Arthur or to offer him any position.  And Arthur is

not alleging a claim stemming from ASI's failure to re-hire him.  Nevertheless,  ASI did

contact Arthur after his position was eliminated and did offer him a job in the machining department. Arthur contends that ASI failed to accommodate his restrictions when it offered him this position, and failed to engage in the interactive process in good faith.

As noted above, Arthur conceded that Whiting's December 9, 2011 letter accurately described the discussions that took place about Arthur's employment between December 2 and 9. According to the letter, during the second conference call among Arthur, Harvey and Whiting on Monday, December 5, Whiting told Arthur that there were positions available on second or third shift in the machining area, and she asked him if he could perform this job with or without accommodation. Arthur did not respond at that time, saying he would have to think about it. Whiting tried to reach Arthur by telephone to follow-up on the job offer. Arthur came to the plant and met with Whiting on December 9, and told her he did not want to accept the machining position. Arthur testified that ASI offered him a machining job and he refused it, saying "I knew there was just no way ... I went and talked to [Whiting] and she told me what position it was." (Arthur Dep. at 67) He thought about it for a day or two and then told Whiting that he wasn't interested. (Id. at 68)

In a declaration filed in opposition to ASI's motion for summary judgment, Arthur contends for the first time that during the conversation on December 5, Whiting "said I would have to give up my restrictions." (Doc. 27-1, Arthur Declaration at ¶10.) Arthur did not recall Whiting making this statement when he was asked about their discussions during his deposition. In his testimony, he admitted that he was offered a machining position, that he thought about it, and he rejected it without asking for a job description or visiting the department. Arthur's declaration attempts to bolster his deposition testimony;

-15-

he was asked repeatedly about the conversation and he never made the claim that Whiting or ASI told him he would have to "give up" his restrictions.  The Court will not consider this statement in considering ASI's motion.  See, e.g., Upshaw v. Ford Motor Co., 576 F.3d 576, 593 (6th Cir. 2009)(internal citations omitted)(the district court should use "a scalpel, not a butcher knife" in striking portions of affidavits that fail to comply with the Rules of Civil Procedure).

Arthur's main contention, as he admitted in his deposition, is that ASI should have placed him into another employee's position, such as in the racking room or a forklift associate, instead of offering him the machining position.  By failing to do so, Arthur contends that ASI failed to accommodate him.  ASI responds that the ADAAA does not require an employer to displace another regular employee, as that is not a "reasonable" accommodation.  Arthur cites US Airways, Inc. v. Barnett, 535 U.S. 391 (2002), where the Supreme Court observed that in some "special circumstances," an employer may have to make an exception to an established seniority system in order to accommodate a disabled employee.  That case does not assist Arthur.  There, the plaintiff (Barnett) injured his back while handling cargo for US Airways.  He invoked his seniority rights under the airline's established seniority system to transfer to a less demanding position in the mailroom.  The seniority system also provided regular opportunities to all employees to bid on jobs based on seniority.  A few years later, two more senior employees bid on Barnett's mailroom position, and Barnett asked for an accommodation by allowing him to keep the position despite the bids.  The airline refused, and Barnett brought an action under the ADA.  The Supreme Court held that the airline had no duty to accommodate Barnett by making an exception to its seniority-based bidding system,

unless Barnett could show that some special circumstances would require a different result.  The Supreme Court did not attempt to define what those "special circumstances" might be in all cases, but offered an example of an employer's seniority system that gave the employer the unilateral right to change the system, and the employer frequently exercised that right.  Another special circumstance could be a system so riddled with exceptions that "one more" exception was unlikely to affect the interests of both employers and employees in uniform enforcement of seniority rights.  Id. at 405.  But the court stressed that it would be plaintiff's burden to show the existence of such special circumstances.

Arthur claims that special circumstances exist here, and that ASI should have given him another employee's job, and transferred that employee to the machining job Arthur was offered.  ASI does not dispute that from time to time, it transfers employees internally.  It did so in December 2011, when ASI shut down one of the production assembly lines and transferred those employees to other open positions in the machining area.  ASI offered that same opportunity to Arthur, and he rejected it.  But Arthur has not shown that ASI permitted employees whose jobs were eliminated (either by the RIF, or by ASI's business decision to close an assembly line, or for any other reason) to "bump" other regular employees out of their jobs.  The only evidence in the record shows that ASI's internal transfers were to open positions, or to positions that were filled with temporary employees.  And Arthur has not identified any open positions or positions occupied by temporary employees, in any of the departments that he contends he should have been transferred to, such as operating a forklift or working in the rackroom.

The Court concludes that Arthur's contention that ASI should have required another regular employee to transfer to another job so that Arthur could fill that position is not a "reasonable" accommodation that is required by the ADAAA.  For this reason, as well as those discussed above, the Court concludes that Arthur's claim that ASI failed to accommodate his disability lacks merit.

## CONCLUSION

For all of the foregoing reasons, the Court finds that ASI is entitled to entry of summary judgment on Arthur's claims of disability discrimination and failure to accommodate his disability.  Arthur's complaint is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: November 4, 2014                    s/Sandra S. Beckwith
                                           Sandra S. Beckwith, Senior Judge
                                           United States District Court